# Exhibit A

Cited
As of: September 8, 2022 9:16 PM Z

# *People v. Vaughn*

Appellate Court of Illinois, Third District

September 15, 2015, Order Filed

Appeal No. 3-12-0996

**Reporter**
2015 IL App (3d) 120996-U *; 2015 Ill. App. Unpub. LEXIS 2063 **

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER VAUGHN, Defendant-Appellant.

**Notice:** THIS ORDER WAS FILED UNDER SUPREME COURT RULE 23 AND MAY NOT BE CITED AS PRECEDENT BY ANY PARTY EXCEPT IN THE LIMITED CIRCUMSTANCES ALLOWED UNDER RULE 23(e)(1).

**Prior History:** [**1] Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, Circuit No. 07-CF-1308. Honorable Daniel J. Rozak, Judge, Presiding.

**Disposition:** Affirmed.

## Core Terms

interview, shot, demeanor, blood, gun, jurors, emotion, prosecutorial misconduct, fired, defense counsel, comments, suicidal, interrogation, e-mails, closing argument, shooting, contends, guilt, hole, bloodstain, stippling, barrel, seat, physical evidence, post trial motion, center console, gunshot wound, trial court, cross-examination, medications

**Judges:** JUSTICE SCHMIDT delivered the judgment of the court. Justices Holdridge and O'Brien concurred in the judgment.

**Opinion by:** SCHMIDT

## Opinion

JUSTICE SCHMIDT delivered the judgment of the court.

Justices Holdridge and O'Brien concurred in the judgment.

**ORDER**

*Held*: The State's comments during opening statements and throughout the course of the trial did not amount to prosecutorial misconduct, where videos of defendant's interrogations constituted admissible evidence by which the jury could freely observe defendant's demeanor. Posttrial comments attributable to one or more jurors did not establish that defendant was deprived due process and did not require trial judge to interview jurors.

[*P2] A Will County jury convicted defendant, Christopher Vaughn, of four counts of first-degree murder. The trial court sentenced defendant to four consecutive terms of life imprisonment.

[*P3] Defendant appeals, claiming the State committed prosecutorial misconduct by, *inter alia*, improperly urging the jury to find defendant's lack of emotion evidence of his guilt and accusing defense [**2] counsel of fabricating a defense. Defendant further contends that his right to an impartial jury was violated, where it was clear that the jury improperly considered defendant's demeanor during his interrogation and trial as evidence of his guilt.

[*P4] We affirm.

[*P5] BACKGROUND

[*P6] On July 25, 2007, a grand jury returned an indictment against defendant on four counts of first-degree murder. The indictment alleged that on June 14, 2007, defendant shot and killed his wife, Kimberly Vaughn, as well as his three children, Abigail, Cassandra, and Blake.

[*P7] The case proceeded to jury trial in August 2012. In its opening statement, the State explained that the evidence would show defendant shot and killed his wife, Kimberly (age 34) his daughters, Abigail (age 12) and

Cassandra (age 11), and his son Blake (age 8) because he wanted to live without obligations in the Canadian wilderness. The State urged the jury to observe defendant's demeanor during his interviews with the police regarding the incident, stating:

> "And you, Ladies and Gentlemen, will be able to assess what his demeanor was like that day. You will be watching hours and hours of these interviews of the defendant and his interaction and his reactions [**3] that day. And you will be able to judge his demeanor, his actions in that interview room on each of those days."

[*P8] The defense, on the other hand, explained that the evidence would show Kimberly committed murder-suicide due to the couple's marital problems. Furthermore, Kimberly was taking prescription medications, Nortriptyline (NT) and Topamax (TP), which are known to cause suicidal behavior.

[*P9] In its case-in-chief, the State called numerous police officers and paramedics who responded to the scene. Their testimony can be summarized as follows.

[*P10] At approximately 5:15 a.m., on June 14, 2007, Channahon police officers were dispatched to a wooded area near the I-55 and Bluff Road interchange. First responders observed a pickup truck and two males, one of whom was defendant. He had blood on his shirt and pants. The second individual was a passerby and the owner of the pickup truck. Paramedics treated defendant at the scene, as he was bleeding from his thigh and left wrist. Defendant displayed no emotion. Officers then discovered a Ford Expedition SUV nearby with an adult female in the front passenger seat and three children in the rear seat, all of whom had received apparent gunshot wounds. [**4] Paramedics checked those individuals for signs of life, but found none. They transported defendant to a nearby hospital, where he was treated and released for the nonlife-threatening wounds to his wrist and thigh. Defendant showed no emotion at the hospital. Police covered the SUV with a large tarp and transported it by flatbed truck to the Will County morgue with the victims' bodies still inside.

[*P11] The State called a number of other witnesses who testified to events leading up to the shooting, as well as the defendant's and Kimberly's personalities and activities.

[*P12] Mark Daniels owned a gun store and indoor shooting range in Plainfield. Daniels testified that defendant signed into the range on June 6, 2007, at 10:25 a.m., and again on June 13, 2007, at 5:30 p.m.

[*P13] Chris Linares, an Illinois State Police (ISP) investigator, read to the jury a number of emails and Internet posts written by Kimberly. These e-mails and posts tended to show generally that her family and school work kept her busy, and that she was stressed on occasion.

[*P14] Susan Phillips, Kimberly's mother, testified that defendant was the type of person who never showed emotion. Del Phillips, Kimberly's father, testified that defendant [**5] was very introverted. Todd Andrlik, a neighbor of the Vaughn family, also testified that defendant was introverted. Reina Carrasco, another neighbor of the Vaughns' testified that when she met defendant, he was very quiet and distant. Alyson Mals, the Vaughns' real estate agent, similarly testified that defendant was a very quiet person who rarely spoke.

[*P15] The State called Gary Larson, an ISP sergeant and the lead investigator on the case. Lawson testified that defendant arrived at ISP Zone 3 headquarters in Lockport at approximately 9:45 a.m., on June 14, 2007. At approximately 10 a.m., Lawson began the interview with defendant. The interview lasted almost 14 hours until about 1:30 a.m. the next day. Prior to the interview, Lawson read defendant his *Miranda* rights, and defendant signed a form waiving those rights. Lawson, along with special agent Joe Stavola, also interviewed defendant at ISP Zone 3 headquarters on June 15 and June 17, 2007. All of the interviews were recorded and shown to the jury.

[*P16] During the June 14 interview, defendant stated that he and his family were going to a water park in Springfield. They left around 5 a.m. While traveling south on I-55, Kimberly said she [**6] was going to be sick. She was taking medication for migraines and other conditions that upset her stomach. They passed a rest stop, but Kimberly did not want to get out of the SUV there because she was shy. Defendant was not sure where he pulled the SUV over. He exited the vehicle to check the luggage carrier as it was rattling. He then reentered the vehicle's driver side and noticed that his leg was bleeding. He exited the SUV to get help, and found a passerby with a pickup truck. At the hospital, the doctor informed him he had been shot. Defendant stated he did not understand how that happened because there was no one around and Kimberly did not have a gun. After he realized he was injured, he was confused and panicked. He owned a gun, but it was at his house. He used it for target practice and had fired a

Case: 1:22-cv-04133 Document #: 17-1 Filed: 11/04/22 Page 4 of 11 PageID #:97

Page 3 of 10

2015 IL App (3d) 120996-U, *120996-U; 2015 Ill. App. Unpub. LEXIS 2063, **6

few rounds at the range in Plainfield the previous day.

 [*P17]  Defendant then explained that he traveled often for work. He was in Mexico in December, had a few drinks, and spent the night with some girls. He told Kimberly about the incident, and the couple had been arguing about it. In addition, Kimberly did not trust him because he had gone to strip clubs. He was planning to take her [**7] on a second honeymoon to repair the damage he had done to his marriage.

 [*P18]  Lawson then informed defendant that Kimberly and the children were dead. Defendant stated they were not dead and asked what happened. He asked Lawson to bring Kimberly in so he could talk to her. Lawson repeatedly asked defendant what happened; defendant responded that he did not know. At some point during the interview, Lawson showed defendant photographs of his children in order to elicit an emotional reaction from him. Lawson felt that defendant's demeanor was not appropriate for someone who had been informed of the death of his children. Defendant consistently denied killing Kimberly and his children, and eventually was allowed to leave headquarters.

 [*P19]  During the June 15 interview, officers continued to question defendant regarding mundane family details, as well as the events of June 14. They challenged defendant to confess, but he did not do so. Defendant stated that after he got back into the SUV, Kimberly shot him. Defendant stated that at that point, his mind shut off and he ran away. He thought the gun was probably the one he had at the shooting range the previous night, but could not figure out how Kimberly [**8] obtained it. During the June 17 interview, officers continued asking defendant questions regarding the Vaughns' family history and the routine of their daily activities. Officers allowed defendant to leave after both of these interviews.

 [*P20]  Erik Lawrenz, a St. Charles, Missouri, police officer, testified that he arrested defendant at a St. Charles funeral home, per the ISP's request, on June 23, 2007.

 [*P21]  Nicole Fundell, an ISP forensic scientist, testified that she was a specialist in firearms, tool marks, and gunshot range determination. She examined the Taurus 9-millimeter handgun, fired cartridges, and fired projectiles in the instant case. Ten spent cartridge cases, 8 fired projectiles, and the handgun were recovered from the SUV. One of the projectiles had a piece of flesh and white and blue fibers on it. Defendant's jeans had a bullet entrance hole on the left upper thigh and an exit hole on the left outer seam. According to Fundell, the gun muzzle was less than six inches from the jeans when it was fired. There were also four bullet holes in defendant's jacket. One was above the right front pocket, one was in the back of the jacket, and two were in the left wrist area. Fundell determined [**9] that these holes were consistent with the passage of a single bullet made when the jacket had been wrapped or layered around the gun before it was fired.

 [*P22]  On cross-examination, Fundell testified she could not definitively rule out the possibility that the hole in the back of his jacket was not created by a separate shot. During the testing she performed, she was unable to reproduce the second hole in a single shot.

 [*P23]  The State then called Stephen Willott. Willott testified that he lives near Ottawa, Ontario, Canada, and met defendant on a Web site in 2006. He and defendant had exchanged a long series of e-mails regarding living in the woods, survival, and camping. Willott had never met defendant in person. Willott read a series of those e-mails to the jury. The e-mails tended to indicate that defendant was frustrated with his life, and wanted to live permanently in the Canadian wilderness. To that end, defendant took a scouting trip to the Yukon Territories in May 2007 to find a suitable place to reside. Defendant asked Willott to help fake defendant's death so Kimberly could get the insurance proceeds, but Willott was uncomfortable with that plan. In an e-mail dated May 23, 2007, defendant [**10] mentioned that he had visited a person named Maya before he left on his scouting trip and thought that he might like to bring her along on his next scouting trip. E-mails from defendant to Willott ceased in June 2007.

 [*P24]  Maya Drake, an entertainer at a gentlemen's club, testified that defendant visited the club about four or five times in 2007. During those visits, defendant informed her that he wanted to leave his wife and live in the woods in Canada. Drake testified that defendant never asked her to move to Canada with him. Defendant told Drake that he was going to leave his wife everything, that she was going to get what she deserved, and she was not going to see it coming.

 [*P25]  Chrystal Miller, an entertainer at a different gentlemen's club, testified that defendant visited the club in June 2007, and made a strange comment about knowing what was going to happen in the future. Miller testified that defendant told her he did not have a family life, did not have children, and had been single for five

Case: 1:22-cv-04133 Document #: 17-1 Filed: 11/04/22 Page 5 of 11 PageID #:98

Page 4 of 10

2015 IL App (3d) 120996-U, *120996-U; 2015 Ill. App. Unpub. LEXIS 2063, **10

years. Defendant spent approximately $4,780 over two visits to the club on June 6 and June 12, 2007.

 [*P26]  Dr. Larry Blum, a forensic pathologist, testified as to the autopsies performed. The bullet **[**11]** wound under Kimberly's chin was "an angle gunshot wound," meaning that the gun was in contact with her chin at the time it was fired. The shot would have incapacitated Kimberly immediately and caused her death very quickly.

 [*P27]  Dr. Blum explained that stippling is gunpowder marks on the skin created by close range gunshots, and that stippling looks like small, dark dots made by a pencil. When a handgun is fired, stippling will occur when the gun is 18 to 24 inches away from the victim's skin.

 [*P28]  Abigail was shot below the right eyebrow and in the right lower chest. There was stippling near both of her wounds. The gunshot wound to Cassandra's head had dense stippling. The gunshot wound to Blake's head had sparse stippling. The stippling present on all the children indicates the gun was, at most, 18 to 24 inches away when it was fired.

 [*P29]  On cross-examination, Dr. Blum testified that he could not rule out the possibility that Kimberly had committed suicide. He also testified that Kimberly had both NT and TM in her system, and that the level of NT was the low end of the toxic level. There were FDA warnings for both NT and TM, indicating that these medications can cause suicidal behavior. On redirect, **[**12]** Dr. Blum testified that the body can redistribute levels of substances in the blood after death, so that the level of NT in her system may have actually been in the normal therapeutic range.

 [*P30]  Kelly Krajnik, an ISP forensic scientist specializing in biology and DNA, testified as to the source and location of the blood stains found on defendant's and Kimberly's clothing, as well as the front seat area of the SUV. Defendant's blood was found on his jacket, Kimberly's seatbelt and buckle, the passenger side of the center console, the driver's seat, Kimberly's shorts and shirt, the floorboard between Kimberly's feet, and a book lying on the floorboard between Kimberly's feet. Kimberly's blood was found on the right lower portion of defendant's jacket, the right side of the driver's seat back, the center console, and obviously, on Kimberly's own clothing.

 [*P31]  The State's expert in shooting scene reconstruction, Matthew Noedel, testified next. According to Noedel, the gun found in the vehicle was a semi-automatic with a round in the chamber. This indicated that the gun had fully cycled after the last shot and was ready to fire. In order for this to happen, the gun had to have been fully supported **[**13]** through its last firing action. Noedel explained that in a suicide shot to the head, there is sometimes insufficient support of the gun after the fatal shot to allow proper cycling in a semi-automatic weapon, causing the gun to jam. Given that the gun in the instant case had fully cycled and had not jammed, Noedel opined that the gun was fully supported throughout the firing action.

 [*P32]  Furthermore, the blood stains on Kimberly's right had were inconsistent with "back splatter," which is small droplets of blood that have been ejected from a gunshot wound and are indicative of suicide. In most suicide cases, there are multiple small droplets of blood encompassing a relatively large area on the hands. Here, Kimberly only had one individual blood droplet on the left hand. The gun did not have blood droplets consistent with back splatter and there was no splatter at all on the trigger guard.

 [*P33]  Abigail, Cassandra, and Blake each suffered one gunshot wound to the torso and one to the head. These shots came from the front passenger seat area of the SUV. The damage to the left wrist of defendant's jacket was consistent with a contact or near contact shot. Like Fundell, Noedel also testified that **[**14]** the holes in the body of defendant's jacket were consistent with first layering the jacket and pressing it against something, then firing the gun. As for defendant's thigh wound, the muzzle of the gun had to be very close to the top of the thigh at the time it was discharged in order for soot to be deposited on the surface of defendant's blue jeans. After Kimberly was shot, she slumped to her left. A person other than Kimberly could have then delivered the shots over her left shoulder toward the back seat. On cross-examination, Noedel conceded that the physical evidence also fit a scenario in which Kimberly shot defendant, the children, and herself.

 [*P34]  The State then called Paul Kish, an expert in bloodstain pattern analysis. Kish testified that defendant's blood was found on the center console, Kimberly's arms, her shorts, the floorboard between her feet, and her seatbelt. Defendant's blood was transferred onto Kimberly's seatbelt by direct contract, and the seatbelt was then retracted. Defendant's blood was deposited in these locations after Kimberly was shot. While Kimberly was still bleeding, an object altered and wiped away some of Kimberly's bloodstains on the

Case: 1:22-cv-04133 Document #: 17-1 Filed: 11/04/22 Page 6 of 11 PageID #:99

Page 5 of 10

2015 IL App (3d) 120996-U, *120996-U; 2015 Ill. App. Unpub. LEXIS 2063, **14

center console. That **[\*\*15]** object was then moved away. This was done by someone other than Kimberly and within seconds to a minute after the blood was deposited on the console. Kish stated the only other person who could have been in a position to alter those bloodstains was defendant. Further, defendant's statements to the police did not properly explain how his blood got onto Kimberly's seatbelt, the center console, Kimberly's shorts, the floor between her feet, or how her blood got onto the side of his jacket.

 **[\*P35]** In its case-in-chief, the defense called Lucien Haag, an independent criminalist and forensic firearms examiner. Haag opined that the holes in the body of defendant's jacket could have been produced by one shot or by two separate shots. Crime scene technicians took a swab of the rim of the gun barrel, but it would have been more probative for the investigators to swab the entire gun barrel to determine whether any biological material was further down inside the barrel. The swab had a reddish speck that may have been blood. Haag stated that if Kimberly's biological material was found well inside the barrel, that would mean the shot that killed her was the last shot fired, as any further shots would have **[\*\*16]** destroyed that material. The fact that defendant's clothes were stuffed together in a bag at the hospital created a possible cross-contamination problem, as material that was on one item could have transferred to another.

 **[\*P36]** The defense's private investigator, Michelle Palaro, testified as to information about Kimberly prior to the shootings. Palaro read for the jury e-mails Kimberly had written to various family members and friends. In an e-mail written to defendant just two weeks prior to the shootings, Kimberly stated that she had informed her doctor that she was having "a big personality change and anxiety change." Other e-mails indicated that Kimberly was experiencing high blood pressure, migraine headaches, and stress.

 **[\*P37]** Dr. Pradeep Bhatia, a neurologist, testified he was treating Kimberly's migraines with NT and TM. During her last appointment on April 11, 2007, he informed her that if she remained free of headaches for the next three months, he would take her off those medications. On cross-examination, Dr. Bhatia testified that Kimberly was not seeing him for depression or suicidal thoughts, and there was no indication she was depressed.

 **[\*P38]** Dr. Richard Steslow, a family doctor treating **[\*\*17]** Kimberly for high blood pressure, testified that she reported increased anxiety in May 2007. Dr. Steslow had no record or independent recollection of suicidal or violent ideation in Kimberly.

 **[\*P39]** The defense then called its bloodstain pattern analysis and crime scene reconstruction expert, Tom Bevel. Bevel concluded that it would have been possible for Kimberly to shoot the children, defendant, and herself, and that it would also have been possible for defendant to shoot Kimberly and the children. He determined that the gun barrel was only swabbed up to 1 1/2 inches from the tip of the barrel, but that if there was blow-back from a self-inflicted would, there could have been tissue or blood further down into the barrel.

 **[\*P40]** On cross-examination, the State inquired as to whether the physical evidence in the SUV matched defendant's statements that he exited the vehicle immediately after being shot. Bevel conceded that it did not.

 **[\*P41]** In its closing argument, the State argued that defendant was the only one who suffered nonlife-threatening wounds, the evidence found in the SUV was inconsistent with his statements to the police, and there was no indication that Kimberly was either homicidal or suicidal. **[\*\*18]**

 **[\*P42]** The defense argued that the State's expert witnesses conceded Kimberly might have been the shooter, she was taking medications, which can cause suicidal behavior, and defendant's lack of emotion proved nothing because he was an introverted person who showed little emotion.

 **[\*P43]** In rebuttal, the State contended that defendant's demeanor during the police interviews and his false statements during the interviews, in addition to the physical evidence, all proved his guilt. The State further argued that the defense had no evidence to support its theory of the case.

 **[\*P44]** Following deliberations, the jury found defendant guilty on all four counts.

 **[\*P45]** Defendant filed a motion for new trial, arguing, *inter alia*, that it was improper for the jury to have considered defendant's lack of emotion during the trial in reaching its verdict. The trial court denied the motion, and sentenced defendant to four consecutive life sentences.

 **[\*P46]** Defendant appeals.

Case: 1:22-cv-04133 Document #: 17-1 Filed: 11/04/22 Page 7 of 11 PageID #:100

Page 6 of 10

2015 IL App (3d) 120996-U, *120996-U; 2015 Ill. App. Unpub. LEXIS 2063, **18

**[*P47]** ANALYSIS

**[*P48]** I. Prosecutorial Misconduct

**[*P49]** Defendant contends that the State committed prosecutorial misconduct in three separate instances throughout the course of the trial. Specifically, that: (1) the State improperly urged the jury to find that defendant's lack of **[**19]** emotion was evidence of his guilt, where that lack of emotion was completely irrelevant and nothing more than a manifestation of his bland, introverted, and low-key personality; (2) the State improperly attacked defense counsel by accusing counsel of fabricating a defense; and (3) the State improperly asserted the falsity of defendant's statements as an evidentiary fact. Such misconduct, defendant argues, amounts to reversible error.

**[*P50]** First, defendant takes issue with the lengthy police interviews shown to the jury, during which he displayed virtually no emotion. Pointing to various statements made by the State during both its opening and closing arguments, defendant claims the prosecutor committed reversible error by urging the jury to consider defendant's demeanor during his interviews with the police as evidence of his guilt. Importantly, defendant does not argue that the videotaped interviews themselves were inadmissible, just that the State's reference to defendant's demeanor in the videos was improper. Some of the State's comments in this regard include:

> "And you, Ladies and Gentlemen, will be able to assess what his demeanor was like that day. You will be watching hours and hours **[**20]** of these interviews of the defendant and his interaction and his reactions that day. And you will be able to judge his demeanor, his actions in that interview room on each of those days.
> * * *
> And you recall the interview and if you look at what the defendant said throughout the entire interview, we are not talking about just a part of it, we are going to talk about the things that he said to the police and the manner in which he acted during that interview which proves his conclusive guilt in this case.
> * * *
> So finally, 1 hour and 11 minutes into that interview, Gary Lawson tells him, Chris, your wife and kids are dead. And what's his reaction? Exactly, there is no reaction. And I mean no reaction whatsoever. He sits there deadpans [*sic*].
>
> And what you see next, think about the worst movie you have ever seen in your life and how bad the acting was. Think about maybe you went to your son's or your daughter's or some young relative, like their first grade Christmas production, the acting you saw in that is better than the acting that Chris Vaughn gave to the Illinois State Police that morning when he was so distraught about his dead family, he was so distraught about his dead relatives, **[**21]** he sat there deadpan. I don't believe that."

**[*P51]** The State contends that defendant failed to properly preserve this issue, where the defendant either made a general objection (*People v. Buie, 238 Ill. App. 3d 260, 274, 606 N.E.2d 279, 179 Ill. Dec. 447 (1992)* (general objections raise only questions of relevance)), or failed to object at trial and include the issue in his posttrial motion. See *People v. Johnson, 238 Ill. 2d 478, 484, 939 N.E.2d 475, 345 Ill. Dec. 632 (2010)* (citing *People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 119 Ill. Dec. 265 (1988))* (When a "defendant fails to object to an error at trial and include the error in a posttrial motion, he forfeits ordinary appellate review of that error.").

**[*P52]** Forfeiture aside, the State's comments referencing defendant's demeanor during the videotaped interrogations were not improper. We find *People v. Theis, 2011 IL App (2d) 091080, 963 N.E.2d 378, 357 Ill. Dec. 425*, instructive. In *Theis*, defendant was convicted of predatory criminal sexual abuse and aggravated criminal sexual abuse. On appeal, defendant argued that the trial court erred in admitting the testimony of the detective regarding defendant's body language during the interrogation and that the prosecutor improperly commented on this testimony during closing argument. *Id. ¶ 47*. Defendant failed to object to the testimony at trial and did not raise the issue in his posttrial motion, but asserted that the issue should be reviewed under plain error. *Id.* The *Theis* court rejected this contention, **[**22]** stating: "[i]t is well settled that testimony regarding a defendant's silence or nonverbal conduct during questioning subsequent to a valid waiver of rights is admissible. *Id. ¶ 48* (citing *People v. Hart, 214 Ill. 2d 490, 514-15, 828 N.E.2d 260, 293 Ill. Dec. 290 (2005))*. Accordingly, the court found defendant did not establish error, plain or otherwise. *Id.*

Case: 1:22-cv-04133 Document #: 17-1 Filed: 11/04/22 Page 8 of 11 PageID #:101

Page 7 of 10

2015 IL App (3d) 120996-U, *120996-U; 2015 Ill. App. Unpub. LEXIS 2063, **22

 **[\*P53]** It is important to note that unlike *Theis*, defendant here does not argue that the trial court erred in admitting the interrogation videos or Lawson's testimony regarding the same. Moreover, defendant conceded in argument on his posttrial motion that the jury could properly consider defendant's demeanor during his interrogation, stating: "[n]ow, the jury can consider Mr. Vaughn's reactions at the time he was interrogated by the Illinois State Police, that is proper for the jury to consider."

 **[\*P54]** The State was free to comment on defendant's demeanor during the interviews. The defense not only could, but did argue that the evidence supported the notion that defendant has a very flat affect. The jury was free to make whatever reasonable inferences it chose to make based upon the evidence. Indeed, *Theis* unequivocally stands for the proposition that the videos constituted admissible evidence, and that it is well within the province **[\*\*23]** of the jury to make inferences from the testimony regarding defendant's nonverbal conduct and demeanor. We agree. We see no reason to depart from that rationale here. The State's comments did not rise to the level of prosecutorial misconduct.

 **[\*P55]** As part of the second subsection of his prosecutorial misconduct claim, defendant contends that the State improperly accused defense counsel of fabricating a defense.

 **[\*P56]** Near the end of its closing argument, the State said, "your verdict must be based on the evidence \*\*\* not possibilities, not speculation, not conjecture, not things that are just plain made up."

 **[\*P57]** During the State's rebuttal argument, the prosecutor stated:
> "I'm not going to ask you to consider anything that's not proven and supported by the evidence, and I'm not going to stand up here and just plain make things up, either."

At a later point during rebuttal argument, the prosecutor stated:
> "And for anyone to come in here and say that [Kimberly] murdered those children, that is not only offensive, it's ludicrous and unthinkable, and more importantly not supported by the evidence, none whatsoever, provides a motive for Kim Vaughn to kill her kids."

 **[\*P58]** Defendant argues these remarks were not **[\*\*24]** only improper personal attacks on the integrity of defense counsel, but also improper accusations that counsel had fabricated a defense. See *People v. Emerson, 97 Ill. 2d 487, 497, 455 N.E.2d 41, 74 Ill. Dec. 11 (1983)*; see also *People v. Willis, 2013 IL App (1st) 110233, ¶ 110, 997 N.E.2d 947, 375 Ill. Dec. 636*.

 **[\*P59]** The State contends that defendant failed to object to any of the comments he now takes issue with on appeal.

 **[\*P60]** Our review of the record indicates that while defendant failed to object to the State's first comment, he did make a general objection to the State's argument that "your verdict must be based on the evidence \*\*\* not possibilities, not speculation, not conjecture, not things that are just plain made up." The defendant also included these issues in his posttrial motion; thus, we consider the merits of defendant's arguments.

 **[\*P61]** It is well established that "the prosecution may not accuse defense counsel of attempting to create reasonable doubt by confusion, misrepresentation, or deception." *Willis, 2013 IL App (1st) 110233, ¶ 110*. Unless supported by the evidence, statements by prosecutors during closing arguments that assert that defense counsel fabricated a defense are therefore improper because they shift the focus of the jury away from the elements of the crime to the objectives of defense counsel. *Emerson, 97 Ill. 2d at 497-98*.

 **[\*P62]** Here, defendant's citation to the prosecutor's comment takes the **[\*\*25]** statement out of context. The entirety of the comment reads as follows:
> "The defense has asked you to focus on what evidence is not there. What isn't there or which piece of the puzzle is missing, but your verdict must be based on the evidence, based on the evidence that's been presented, not possibilities, not speculation, not conjecture, not things that are just plain made up."

 **[\*P63]** The prosecutor did not refer specifically to defense counsel, nor did the prosecutor state that defense counsel actively concocted a theory or evidence. Rather, when viewed in light of the State's theory of the case, the prosecutor was alluding to defendant's dubious explanation for what happened to his family that day. This is a far cry from the impermissible comments in *Emerson*, where the State's Attorney stated to the jury that defense counsel had laid down a smokescreen "composed of lies and misrepresentations and innuendoes," and that the defense attorneys tried to "dirty up the victim" to distract the attention of the jury from the defendant's crime.

Case: 1:22-cv-04133 Document #: 17-1 Filed: 11/04/22 Page 9 of 11 PageID #:102

Page 8 of 10

2015 IL App (3d) 120996-U, *120996-U; 2015 Ill. App. Unpub. LEXIS 2063, **25

*Emerson, 97 Ill. 2d at 497*.

**[\*P64]** Moreover, this comment was in direct response to defense counsel's closing argument in which he stated:

> "That is a piece of the puzzle that is actually **[\*\*26]** here that you can consider. And we have missing pieces and we have pieces that are present and some pieces carry more weight than others you'll see."

**[\*P65]** As any defense counsel would, he attempted to call into question the State's theory of the case, pointing out that Kimberly took certain medications that could make her suicidal and alluding that there may have been some type of suicide note. However, it is well established that the during closing argument, the prosecution may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite a response, and comment on the credibility of witnesses. *People v. Burman, 2013 IL App (2d) 110807, ¶ 25, 986 N.E.2d 1249, 369 Ill. Dec. 613*. When a defendant's own closing argument attacked the prosecution's case and its witnesses, the prosecution is entitled to respond thereto in its rebuttal closing argument, particularly when that response is invited. *People v. Nieves, 193 Ill. 2d 513, 532, 739 N.E.2d 1277, 251 Ill. Dec. 155 (2000)*.

**[\*P66]** We, therefore, find that the State's comments in rebuttal closing argument were not improper and did not rise to the level of prosecutorial misconduct.

**[\*P67]** Finally, defendant argues that the State's prosecutorial misconduct in this case was not limited to its rebuttal argument. According to defendant, **[\*\*27]** the State also improperly elicited testimony from its expert witness and a defense expert witness that defendant's statements to the police contained falsehoods regarding his actions following the shootings.

**[\*P68]** Defendant specifically takes issue with the State's bloodstain pattern analysis expert Paul Kish, who testified on direct examination that defendant's statements to the police did not properly explain how his blood got onto Kimberly's seatbelt, the center console, Kimberly's shorts, the floor between her feet, or the side of defendant's jacket. During its cross-examination of Tom Bevel, defendant's expert in bloodstain pattern analysis and crime scene reconstruction, the State elicited testimony that the physical evidence in the SUV did not match defendant's statements that he exited the vehicle immediately after being shot. Defendant contends that these statements constituted an improper invasion of the province of the jury to determine for itself whether defendant's statements were false.

**[\*P69]** Defendant concedes that this issue may not be properly preserved, but urges this court to consider it under the constitutional issue exception, where prosecutorial misconduct can rise to the **[\*\*28]** level of a constitutional due process violation. *Greer v. Miller, 483 U.S. 756, 765, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987)* (recognizing that prosecutorial misconduct may "'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process'" (quoting *Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)))*. That did not happen here. We find the issue forfeited.

**[\*P70]** Notwithstanding forfeiture, we fail to see how the testimony of expert witnesses can be classified as prosecutorial misconduct in this instance, thereby negating defendant's argument in its entirety. The issue is an evidentiary one where the trial judge has broad discretion in determining the admissibility of expert testimony. *People v. Cardamone, 381 Ill. App. 3d 462, 500, 885 N.E.2d 1159, 319 Ill. Dec. 479 (2008)*. As the State correctly notes:

> "Generally, an individual may testify as an expert if his or her qualifications display knowledge that is not common to laypersons and if the testimony will aid the trier of fact in reaching its conclusion. [Citation.] An expert witness may provide an opinion on the ultimate issue in a case. [Citation.] The test is whether the opinion will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

**[\*P71]** Here, experts Kish and Bevel provided testimony that would aid the jury in determining the timeline of events, *i.e.*, whether the defendant's blood could **[\*\*29]** have been deposited on Kimberly before she was shot. Indeed, defendant's theory of the case, that Kimberly was the shooter, raised a factual issue as to the timeline. That the State was able to elicit from the defense's own witness that defendant's explanation for what happened did not comport with the physical evidence does not serve to transform this into prosecutorial misconduct. Bevel did not opine that defendant shot the victims. This is further supported by the well-established principle that a trier of fact is not required to accept the expert witness's conclusion, thus

Case: 1:22-cv-04133 Document #: 17-1 Filed: 11/04/22 Page 10 of 11 PageID #:103

Page 9 of 10

2015 IL App (3d) 120996-U, *120996-U; 2015 Ill. App. Unpub. LEXIS 2063, **29

such testimony cannot be said to usurp the province of the jury. See *Richardson v. Chapman, 175 Ill. 2d 98, 107-08, 676 N.E.2d 621, 221 Ill. Dec. 818 (1997)*; see also *People v. Kando, 397 Ill. App. 3d 165, 196, 921 N.E.2d 1166, 337 Ill. Dec. 28 (2009)*.

 [*P72]  In essence, the State asked its expert on direct and defendant's expert on cross whether the evidence matched the scenario presented by defendant to police. Neither the questions nor the responding testimony constituted error. See generally, *People v. Terrell, 185 Ill. 2d 467, 496-97, 708 N.E.2d 309, 236 Ill. Dec. 723 (1998)*.

 [*P73]  Accordingly, we find that neither the expert witnesses' testimony nor any of the State's comments during the course of the trial rose to the level of prosecutorial misconduct.

 [*P74]  II. Impartial Jury

 [*P75]  Defendant also contends that the jury improperly considered defendant's lack of emotion as evidence **[**30]** of his guilt, thus violating his constitutional right to an impartial jury. He further asserts that the trial court erred in denying is motion for a new trial without interviewing any of the jurors regarding this alleged misconduct.

 [*P76]  A criminal defendant's right to due process in the form of an unbiased jury is a substantial and fundamental right provided for by both the Illinois and federal constitutions. *U.S. Const., amends. V*, *VI*, XIV § 1; *Ill. Const. of 1970, art. I, §§ 2*, *8*. A jury that considers matters not in evidence violates the defendant's right to an unbiased jury. *People v. Szymanski, 226 Ill. App. 3d 115, 121, 589 N.E.2d 148, 168 Ill. Dec. 34 (1992)*. Evidence includes any means by which an alleged matter of fact is proved or disproved, such as witness testimony, documents, exhibits and physical objects. See *People v. Foss, 201 Ill. App. 3d 91, 94-5, 559 N.E.2d 254, 147 Ill. Dec. 254 (1990)*. A defendant's demeanor, other than while testifying, cannot prove or disprove any alleged matter of fact and is therefore not evidence. *People v. Bowen, 298 Ill. App. 3d 829, 837, 699 N.E.2d 1117, 232 Ill. Dec. 932 (1998)*. The question of whether jurors have been influenced and prejudiced to such an extent that they would not, or could not, be fair and impartial involves a determination that must rest in sound judicial discretion. *People v. Runge, 234 Ill. 2d 68, 104, 917 N.E.2d 940, 334 Ill. Dec. 865 (2009)*. That discretion extends into the trial court's initial decision of whether or not to interrogate the jurors based on an allegation of impartiality. *Id. at 105*.

 [*P77]  Defendant claims **[**31]** that the comments made by jurors to local news media outlets following the verdict clearly demonstrate that the jury improperly relied on defendant's lack of emotion following his arrest and during his trial. Defendant states that in one such report, a juror indicated that defendant's lack of emotion was an important factor in the case. Defendant also contends that the foreman indicated that the jury considered defendant's lack of emotion following his arrest and during trial in determining that he was guilty. Specifically, the jury foreman stated that "[a]nother thing that we talked about *** Christopher Vaughn's reaction *** not only when he first was located but throughout the course of the trial even."

 [*P78]  Notably, defendant does not argue that the jury's consideration of his lack of emotion during his interrogations alone denied him a fair trial. Nor does defendant argue that the jury's consideration of his demeanor at trial alone denied him a fair trial. He argues it was both. However, as previously established in *Theis (supra ¶ 52)* and conceded by defendant in his posttrial motion, the jury was free to consider defendant's demeanor in the properly admitted videotaped interviews. See *People v. Theis, 2011 IL App (2d) 091080, ¶ 47*. To **[**32]** the extent that the jury may have considered defendant's demeanor at trial, it was cumulative and insignificant in comparison to the hours of videotaped interviews the jury had already witnessed. In light of the overwhelming evidence of defendant's guilt—physical evidence and bloodstain pattern analysis, expert testimony that defendant's story did not jive with the physical evidence and, in particular, evidence of defendant's demeanor when interrogated—any error by the jury in considering defendant's demeanor at trial is harmless beyond a reasonable doubt. This conclusion is further bolstered by the holding of *Bowen*, where the court found the trial judge's comment on defendant's demeanor at trial where did defendant did not testify was improper, but harmless. *Bowen, 298 Ill. App. 3d at 837*. Like Bowen, defendant failed to demonstrate how the statements constituted a material factor in the outcome of his trial. *Id.*

 [*P79]  Defendant's claim must also fail where it does not take into consideration the well-established rule that a jury verdict may not be impeached by the testimony of the jurors. *People v. Holmes, 69 Ill. 2d 507, 511, 372 N.E.2d 656, 14 Ill. Dec. 460 (1978)*. "It is well settled that a statement by a juror taken after the jury has

Case: 1:22-cv-04133 Document #: 17-1 Filed: 11/04/22 Page 11 of 11 PageID #:104

Page 10 of 10

2015 IL App (3d) 120996-U, *120996-U; 2015 Ill. App. Unpub. LEXIS 2063, **32

rendered its verdict, has been polled in open court, [**33] and has been discharged will not be admitted to impeach the jury's verdict." *People v. Hobley, 182 Ill. 2d 404, 457, 696 N.E.2d 313, 231 Ill. Dec. 321 (1998)*. This rule prevents consideration of posttrial juror testimony showing "the motive, method or process by which the jury reached its verdict." (Internal quotation marks omitted.) *People v. Sullivan, 2011 IL App (4th) 100005, ¶ 21, 960 N.E.2d 65, 355 Ill. Dec. 622* (citing *Hobley, 182 Ill. 2d at 457*). An exception to this rule is made in situations where proof of improper *external* influence on the jury is shown. See *Holmes, 69 Ill.2d 507, 510-11, 372 N.E.2d 656, 14 Ill. Dec. 460* (concerning a jury's independent investigation and gathering of evidence not presented during trial); see also *Hobley, 182 Ill.2d at 458-59* (involving, *inter alia*, nonjuror communication with jurors during deliberations). However, even in cases where jurors may testify as to the nature of *outside* influences, evidence of the effect of those influences on the mental processes of the jurors is inadmissible. *Holmes, 69 Ill. 2d at 514*.

 [*P80] Here, defendant does not allege that the jury was subject to any outside influence. Nor did defendant present any juror affidavits alleging juror misconduct, or that jurors were intimidated by nonjurors during their deliberations, as was the case in *Hobley. Hobley, 182 Ill. 2d at 456*. Defendant argues only that, based on snippets from news reports, the jurors may have considered his demeanor at trial after the fact. These are precisely the types of comments that [**34] go to the motive, method, and process by which the jury reached its verdict, and are thus inadmissible. *Sullivan, 2011 IL App (4th) 100005, ¶ 26*.

 [*P81] We therefore find that the jurors' posttrial comments did not impeach the verdict, and the trial court did not err in denying defendant's motion for a new trial on that same basis.

 [*P82] CONCLUSION

 [*P83] For the foregoing reasons, the judgment of the circuit court of Will County is affirmed.

 [*P84] Affirmed.

End of Document

Marci Sahinoglu